RECORD NO. 12-4625

In The

# United States Court of Appeals
### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

**v.**

## HENRY STEPHENS,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE**

————————

**BRIEF OF APPELLANT**

————————

Christopher F. Cowan
LAW OFFICE OF CHRIS F. COWAN
713 South Front Street
Columbus, Ohio 43206
(614) 884-8800

*Counsel for Appellant*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUE...................................................................1

STATEMENT OF THE CASE.....................................................................1

SUMMARY OF ARGUMENT ..................................................................16

ARGUMENT ............................................................................................21

I.    Standard of Review. .....................................................................21

II.   The district court erred in denying Stephens' second motion to suppress by finding that, despite the illegal warrantless use of a GPS device, the exclusionary rule should not apply because the law enforcement officers acted in good faith.....................................................21

CONCLUSION .........................................................................................48

REQUEST FOR ORAL ARGUMENT ....................................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Arizona v. Evans*,
    514 U.S. 1 (1995)....................................................................23, 41, 43

*Arizona v. Gant*,
    556 U.S. 332 (2009)..................................................................23, 24

*Brown v. Illinois*,
    422 U.S. 590 (1975)..................................................................21, 47

*Davis v. United States*,
    131 S.Ct. 2419 (2011)..............................................................*passim*

*Groh v. Ramirez*,
    540 U.S. 551 (2004)........................................................................40

*Herring v. United States*,
    555 U.S. 135 (2009)..................................................................23, 41, 43

*Illinois v. Krull*,
    480 U.S. 340 (1987)................................................................*passim*

*Katz v. United States*,
    389 U.S. 347 (1967)................................................................*passim*

*Mapp v. Ohio*,
    367 U.S. 643 (1961)........................................................................22

*Massachusetts v. Sheppard*,
    468 U.S. 981 (1984)..................................................................23, 41, 43

*New York v. Belton*,
    453 U.S. 454 (1981)........................................................................23

*United States v. Andres*,
    703 F.3d 828, 834 (5th Cir. 2013) ................................................19, 38, 39, 40

*United States v. Calandra*,
    414 U.S. 338 (1974).............................................................22, 47

*United States v. Davis*,
    598 F.3d 1259 (11th Cir. 2010), *aff'd* 131 S. Ct. 2434 (2011).....................45

*United States v. Garcia*,
    474 F.3d 994 (7th Cir.), *cert. denied*, 552 U.S. 883 (2007) ........20, 34, 36, 45

*United States v. Gonzalez*,
    71 F.3d 819 (1996) ...................................................................23

*United States v. Johnson*,
    457 U.S. 537 (1982)...................................................................45

*United States v. Jones*,
    132 S. Ct. 945 (2012).............................................................*passim*

*United States v. Karo*,
    468 U.S. 705 (1984)...............................................................*passim*

*United States v. Knotts*,
    460 U.S. 276 (1983)...............................................................*passim*

*United States v. Lee*,
    862 F. Supp. 2d 560 (E.D. Ky. 2012)............................................46

*United States v. Leon*,
    468 U.S. 897 (1984)...............................................................*passim*

*United States v. Marquez*,
    605 F.3d 604 (8th Cir.2010) ............................................34, 36, 45

*United States v. Martin*,
    664 F.3d 684, 686 (7th Cir. 2011),
    *reh'g denied*, No. 11-1696,
    2013 WL 1197849 (7th Cir. Mar. 25, 2013) .........................*passim*

*United States v. Matlock*,
    415 U.S. 164 (1974)...................................................................21

*United States v. Maynard,*
    615 F.3d 544 (D.C. Cir. 2010),
    *aff'd on other grounds sub nom,*
    *United States v. Jones,* 132 S. Ct. 945 (2012) ............................18, 29, 34, 45

*United States v. Michael,*
    645 F.2d 252 (5th Cir.), *cert. denied,* 454 U.S. 950 (1981) ..................*passim*

*United States v. Moss,*
    963 F.2d 673 (4th Cir. 1992) ................................................................*passim*

*United States v. Ortiz,*
    878 F. Supp. 2d 515 (E.D. Pa. 2012) ............................................................32

*United States v. Perkins,*
    363 F.3d 317 (4th Cir. 2004), *cert. denied,* 543 U.S. 105 (2005) .................21

*United States v. Pineda–Moreno,*
    591 F.3d 1212 (9th Cir.2010), *vacated,* 132 S.Ct. 1533 (2012).............34, 45

*United States v. Pineda-Moreno,*
    688 F.3d 1087, 1091 (9th Cir. 2012),
    *cert. denied,* 133 S. Ct. 994 (2013)......................................................19, 38, 39

*United States v. Simons,*
    206 F.3d 392 (4th Cir. 2000) ........................................................................40

*United States v. Smith,*
    387 F. App'x 918 (11th Cir. 2010)........................................................34, 45

*United States v. Sparks,*
    No. 11-1134, 2013 WL 1197741 (1st Cir. Mar. 26, 2013) .........19, 38, 39, 40

*United States v. Villa,*
    No. 10-30080, 2012 WL 5352101 (9th Cir. Oct. 31, 2012).............19, 38, 39

*Virginia Soc'y for Human Life, Inc. v. Fed. Election Comm'n,*
    263 F.3d 379 (4th Cir. 2001) .......................................................20, 26, 31, 37

*Wong Sun v. United States*,
   371 U.S. 471 (1963)...................................................................................47

## Constitutional Provisions

U.S. Const. amend. IV ...................................................................*passim*

## Federal Code Sections

18 U.S.C. § 922 ............................................................................................1

28 U.S.C. § 1291 ..........................................................................................1

## Federal Rules

Fed. R. Crim. P. 11(a)(2) ......................................................................2, 48

## JURISDICTIONAL STATEMENT

The defendant-appellant, Henry Stephens ("**Stephens**") appeals the final judgment of the United States District Court for the District of Maryland, at Baltimore, filed on July 23, 2012.  Stephens timely filed a notice of appeal on August 2, 2012.  This court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

1.      Did the district court err in denying Stephens' second motion to suppress by finding that, despite the illegal warrantless use of a GPS device, the exclusionary rule should not apply because the law enforcement officers acted in good faith?

## STATEMENT OF THE CASE

This case arises from the unlawful, warrantless use of a Global-Positioning-System ("GPS") tracking device.  Use of this GPS device allowed police to obtain evidence leading to Stephens' being indicted for being a felon in possession of a firearm on May 16, 2011, in violation of 18 U.S.C. § 922(g)(1).  (JA 12).

Stephens filed a motion to suppress evidence obtained from the warrantless use of the GPS device, which the parties fully briefed, and the district court heard and denied on November 21, 2011.  (JA 14-62, 63, 211, 214).  On January 23, 2012, the Supreme Court decided *United States v. Jones*, 132 S. Ct. 945 (2012).  Given the *Jones* decision, the district court vacated its prior ruling and established

a new briefing schedule on the suppression issue.  (JA 218).  Stephens filed a second motion to suppress the same evidence, which the parties fully briefed, and the district court heard and denied on March 28, 2012.  (JA 225-349, 351-52, 479-80).  This time the court found that police use of the GPS device constituted an illegal  search, but that the exclusionary rule should not apply because the police acted in good faith.  (JA 479).

On April 23, 2012, Stephens entered a conditional guilty plea to the firearms charge pursuant to a plea agreement and Fed. R. Crim. P. 11(a)(2).  (JA 487-88, 489, 492-93, 501-03, 512-13, 516, 522).  With the court and the government's consent, Stephens reserved in the written plea agreement and the Rule 11 hearing the right to have an appellate court review the denial of his second motion to suppress.  (*Id.*).  The district court thereafter sentenced Stephens to 70 months imprisonment and three years supervised release.  (JA 526).

## STATEMENT OF FACTS

**1.      Source of evidence during the second suppression hearing.**

The district court based the denial of the second suppression motion on evidence received during the hearing on March 28, 2012.  (JA 351-483).  One witness testified, namely Detective Paul Geare ("**Detective Geare**").  (JA 357-440).  The court also accepted offers of proof in lieu of testimony from Officer

Matthew Ensor ("**Officer Ensor**") and Sergeant Michael Johnson ("**Sergeant Johnson**").  (JA 441-46).

During the hearing, the court received in evidence the following Government's Exhibits: 1 (a printout of the GPS tracking coordinates); 2A through 2H (photographs of the automobile and items seized); 3 (Detective Geare's notes); 4 (K-9 scan sheet); 5 (map of travel of automobile with time chart); 6 (firearm); 7 (holster); 8 (security jacket); 9 (ballistic vest); and 10 (mace).  (JA 394, 396-403, 446-47, 535, 538-621).   The court also received in evidence the following Defendant's Exhibits: 1 (transcript of first suppression hearing on November 21, 2011); 2 (photograph of the holster); and 3 (photograph of Stephens on the night of his arrest).  (JA 352-53, 434, 536, 692, 705; JA 63-213).

### 2.    Summary of the facts from the second suppression hearing.

Detective Geare was a detective for the Baltimore City Police Department assigned to the ATF as a Task Force Officer.  (JA 357, 405).    On   January   24, 2011, an informant (the **"informant"**) provided Detective Geare with information about a person named "Henry", later identified as Stephens.  (JA 359, 408).  The informant advised Detective Geare that this person worked security at Club Unite (the "**club**").  (JA 359).  The informant said that this person wore a security jacket and a bullet proof vest, and had been seen carrying a handgun.  (JA 359, 410).  The informant never described these items.  (JA 415-16).

**3**

The informant did not supply this person's address, but indicated that he drove a silver Chrysler 3000 (the "**Chrysler**").  (JA 359, 411).  The informant identified the tag number to the Chrysler.  (*Id.*).  Investigators traced this number to an Aleisha Stephens at 4 Peabody Court in Parkville, Maryland (the "**residence**"), which is an apartment situated in an apartment complex (the **apartment complex**").  (JA 359, 363).  Investigators believed Aleisha Stephens was then serving in the military overseas.  (JA 366).  With this address, investigators obtained Stephens' full name and photograph, and presented the photograph to the informant, who identified Stephens as the person from the club.  (JA 359-60).

According to the informant, Stephens was involved in trafficking cocaine from Baltimore to West Virginia.  (JA 360).  However, the informant never said that he actually saw Stephens with drugs, never provided details of drug deals involving Stephens – such as date, time and location, and never identified the particular city in West Virginia to and from which Stephens was transporting drugs.  (JA 411, 413).  Instead, the informant generally stated that at unspecified times Stephens traveled to West Virginia with "narcotics".  (*Id.*).  The informant indicated that Stephens said that he had a prior armed robbery conviction in Georgia, which investigators later confirmed.  (JA 360).  Investigators also determined that Stephens had a prior conviction for distribution or conspiracy to distribute crack cocaine in West Virginia.  (*Id.*).

As of January 24, 2011, the informant had not provided Detective Geare with any information that led to other arrests or established his reliability. (JA 408, 410). Instead, Detective Geare relied upon reports of the informant's work. (JA 408-10). Specifically, the detective spoke to detectives from the Baltimore City Police Department about this informant's cooperation. (JA 408). He learned that the informant provided reliable information that led to arrests. (JA 408-09). But since this cooperation the informant had recently been arrested, faced state and possible federal charges, and had multiple drug convictions. (JA 405-08).

Detective Geare said investigators periodically dropped by the club and the residence to see if Stephens was there. (JA 361). Detective Geare specifically went to the club 10 times and only saw Stephens twice. (JA 416). And on these two occasions, Stephens was not wearing a security jacket or a bullet proof vest, was not visibly armed, and made no gestures or "security checks" suggesting that he was armed. (*Id.*). Otherwise, Detective Geare never had the informant call when Stephens was working at the club and actually wearing the security jacket, the bullet proof vest and the handgun. (JA 417-18).

On March 9, 2011, around 5:00 or 5:30 a.m., Detective Geare arranged for a drug detection dog ("**K-9**") to scan the Chrysler, which was parked at the apartment complex. (JA 371-72). The handler told Detective Geare that the K-9 alerted to the Chrysler. (JA 372). Up to this point, Detective Geare could not

5

recall seeing Stephens drive the Chrysler. (JA 420-21). Nor were there police reports indicating that Stephens had been driving this vehicle at this time. (*Id.*).

Investigators decided to use a GPS device, which was a small black box, about five inches by five inches, and two and one-half inches thick. (JA 361). The device is installed by a magnet to the undercarriage or bumper of an automobile. (*Id.*). The device emits a signal that allows an officer to monitor its movements with an internet connection to an iPhone or a laptop. (JA 376-77). Once logged into the server, an officer can pull up a map and ascertain where the GPS device is at the time. (JA 377). The appearance is similar to the display utilized for navigation programs on an iPhone. (JA 377).

Investigators used a battery operated GPS device to monitor the Chrysler from March 18 to April 12, 2011, and then from May 13 to May 16, 2011. (JA 366, 369-71, 374, 399). In both instances, the GPS device was installed by a magnet to the rear bumper of the Chrysler. (JA 361-62, 374). And both attachments to the Chrysler were made when the same was parked in the apartment complex parking lot, which was open to the public. (JA 362, 366, 374).

After the first installation of the GPS device on March 18, 2011, investigators started receiving information from this unit on March 20, 2011, and continued to receive data until April 12, 2011. (JA 366-67, 369-70). Investigators "spot monitored" the Chrysler with the GPS unit. (JA 367-68). During this time,

based solely on GPS data, investigators determined that the Chrysler twice travelled to West Virginia. (JA 368-69, 425). But investigators never stopped or interdicted the Chrysler on these occasions, and did not know who went to West Virginia in this vehicle. (JA 369, 425).

On April 12, 2011, based solely on the GPS data, investigators drove to where the Chrysler parked in West Virginia. (JA 368-69, 414, 425). Investigators determined that this parking spot was near an address associated with a co-defendant in Stephens' prior drug conspiracy conviction, namely the Eva Robinson ("**Robinson**"). (JA 368-69, 425). Investigators then suspected that Stephens was trafficking cocaine back and forth to West Virginia. (JA 369). However, investigators never verified or saw Robinson at this address. (JA 368). Nor did the informant ever mention Robinson. (JA 412).

Also on April 12, 2011, investigators removed the GPS device from the Chrysler, which was parked in the apartment complex parking lot. (JA 370-71). Detective Geare thought the device probably was removed to recharge the battery, but said it could have been removed for another investigation. (JA 362, 370).

On May 13, 2011, investigators re-installed the GPS device and started harvesting data therefrom. (JA 373-74, 399). On May 16, 2011, investigators decided to conduct surveillance on Stephens. (JA 374). This date is significant because it was a Monday and the informant said Stephens worked at the club on

7

Monday nights. (JA 375). However, the GPS data in Government's Exhibit 1 reflects that the Chrysler was located at the club just two out of four prior Monday nights that the device was used in this case. (JA 423, 428-29). Specifically, the address for the club is 4500 Erdman Avenue. (JA 402). According to the GPS data, the only prior Mondays nights that that Chrysler was at this address were March 28, 2011 and April 11, 2011. (JA 559, 598).

According to Detective Geare, the plan was to conduct surveillance, develop probable cause for a traffic stop, and if nothing else, approach Stephens when he arrived at the club. (JA 375). Detective Geare drove one vehicle with Sergeant Johnson riding in the passenger seat and monitoring the GPS device. (JA 376-78, 443-44). Special Agent Dan Kerwin ("**Special Agent Kerwin**") accompanied them in a separate vehicle. (JA 376-78).

The surveillance commenced at 66th Street and Route 40, which coincides with an unidentified school. (JA 375). Investigators had information that Stephens was going to school that night, but did not know where the school was. (JA 376). Investigators used the GPS device to locate Stephens' Chrysler, which was parked at this school at 8:04 p.m. (JA 376, 401). Investigators did not see the Chrysler, but relied on the GPS signal. (JA 376, 379). Investigators waited in the parking lot until the Chrysler started moving on the GPS monitoring screen. (JA 379, 96). Once the Chrysler started moving, it did not head toward the bar. (JA 380).

**8**

Investigators assumed that the Chrysler was headed toward the apartment and therefore also went to the apartment. (JA 380-81).

Upon arriving at the apartment complex, investigators observed the parked Chrysler. (JA 381, 444). GPS data revealed that the Chrysler arrived here at 8:17 p.m. (JA 401). Between 8:20 and 8:30 p.m., investigators saw Stephens exit the apartment and walk to the Chrysler. (JA 382). Detective Geare saw Stephens reach with his right hand back around his waistband area and then fix his shirt like he was trying to cover something up. (JA 382-83). Detective Geare perceived this motion to be a "security check." (JA 383-84). Detective Geare said he has had to make the same kind of movement to adjust his weapon. (JA 384). Detective Geare looked at Sergeant Johnson, who saw this same movement. (JA 384, 444). Both thought Stephens was armed and getting ready to go to work at the club. (JA 385). Detective Geare said that, at this moment, they had a reasonable, articulable suspicion that Stephens had a gun and decided to stop him. (JA 435).

Stephens entered the Chrysler and began to leave. (JA382-83). GPS data revealed that he left at 8:22 p.m. (JA 401). At the time, only the three law enforcement officers were working the surveillance, namely Detective Geare, Sergeant Johnson and Special Agent Kerwin. (JA 376-78, 385). No other officers or K-9 units were specifically tasked with conducting surveillance on Stephens or waiting at the club for him. (JA 386-88). Instead, upon seeing this movement,

Detective Gear and the other two commenced notifying other officers in an effort to obtain assistance at the club. (JA 385). Detective Geare also contacted Officer Ensor, who operated a K-9 unit and was available. (JA 386, 441-43). However, Officer Ensor was generally available to any officer in the city that needed a K-9 unit. (JA 443). While Detective Geare asked Officer Ensor to remain on standby, the detective at this time did not inform him when or where to respond. (JA 442).

When Stephens pulled out, investigators expected him to make a left turn in the direction of the bar. (JA 389). But instead, Stephens made a right turn. (*Id.*). Investigators followed him on the GPS. (JA 389, 444). Investigators later determined from the GPS data that Stephens stopped at a Chipotle Grill and left there at 8:42 p.m. (JA 389-40, 402). Detective Geare thought Stephens then entered the beltway and headed toward the club. (JA 390). Detective Geare did not catch up to Stephens until after he was already at the club. (JA 390).

GPS data revealed that Stephens arrived at the club parking lot at 9:00 p.m. (JA 402). By the time Detective Geare pulled up, Stephens had parked his Chrysler and other detectives apprehended him. (JA 391, 402). Officers recovered from Stephens a vinyl holster but no weapons. (JA 391, 444).

A K-9 alerted to the Chrysler at 9:10 p.m. at the driver's side, the trunk and the rear bumper. (JA 392-94, 396, 441). Detective Geare read Stephens his Miranda rights at 9:11 p.m. (JA 393). Officers recovered from the trunk a jacket

**10**

on a hanger, with a bullet proof vest inside the jacket, and a handgun inside a pouch in the vest. (JA 397-98, 444). Officers also recovered a can of pepper spray from the trunk. (JA 398, 444). Stephens informed investigators that he used the holster to carry mace and that he worked security at the club. (JA 403-04). Sergeant Johnson determined that the handgun fit in this holster. (JA 96). Detective Geare identified a photograph of Stephens, which reveals that he wore a tight fitting t-shirt and no jacket. (JA 434, 692).

Detective Geare never obtained a warrant, a court order or anything like that to authorize his placement and use of the GPS device on the Chrysler. (JA 362). Nor did he ever attempt to obtain such a warrant. (JA 121). At the time, he was not aware of any law in Maryland that required him to obtain a search warrant prior to attaching or using the GPS device. (JA 363-64). Nor was he aware of any federal or state legal opinions that required law enforcement officers to obtain a search warrant prior to the foregoing use of a GPS device. (JA 364). Detective Geare previously used such GPS devices without obtaining a warrant, and the warrantless use of such devices was a common practice for law enforcement. (*Id.*).

Detective Geare did not engage in any discussion about whether to obtain a warrant, despite having access to the U.S. Attorney's office, the State's Attorney's Office, legal counsel for the city police department, the ATF, and the courts. (JA 364-65, 422). Nor was he told by any of the foregoing that a warrant was required.

**11**

(JA 364-65). Nor did he conduct legal research to ascertain the lawfulness of the warrantless use of the GPS device. (JA 422). And he did not have consent to install the GPS device on the Chrysler. (JA 121).

### 3. The district court's findings of fact and conclusions of law.

At the conclusion of the evidence, the district court initially determined, and the government agreed, that police conducted two unlawful searches by installing the GPS device onto the Chrysler from March 10 to April 12, 2011, and then from May 13 to May 16, 2011.[1] (JA 448-49). The government also conceded that illegal use of the GPS device put Detective Geare and his partners at the school, and then the residence, and then the club at the specific times that observations were made and evidence was obtained. (JA 450-51). The district court concluded, and the government conceded, that the evidence should be suppressed unless the investigators acted in good faith. (JA 450-51).

---

[1]    In the Government's Response to Second Motion to Suppress, the government asserted as follows: (1) investigators had a reasonable, articulable suspicion of criminal activity to stop and frisk Stephens, with the K-9 alert then ripening this suspicion into probable cause; (2) the link between the evidence and the first use of the GPS was attenuated; (3) the evidence would have inevitably been discovered based on untainted information that supported probable cause; (4) the investigators acted in good faith; (5) the evidence was obtained from the K-9, which source was independent of the illegal GPS searches; and (6) Stephens' statement was voluntary. (JA 253-63). The district court rejected these arguments, finding that the evidence was tainted and should be suppressed unless the investigators acted in good faith. (JA 448-51, 475-76). The government conceded this finding by the district court and has not noted an appeal. (*Id.*).

12

The argument during this hearing then proceeded to the applicability of the good faith exception to the exclusionary rule. (JA 451). On this issue, the district court observed in the first suppression hearing that there was no "clear precedent to guide the Court, other than the broad general notions that monitoring people -- law enforcement monitoring of citizens in other otherwise public places does not implicate the 4th Amendment." (JA 210; *see also* JA 452). Ultimately, during the argument on the second suppression hearing, the district court determined that GPS devices are like beepers, stating as follows:

> This is not cell phones. This is not some of the cutting edge technology. Beepers have been around for decades. And there's a whole body of law that has emerged around them. And I'm confident that had the police officers gone and had those meetings with their legal advisors, they would have been told, pre *Jones*, that this issue was largely settled when *Katz versus United States* was decided, when the Supreme Court said that the 4th Amendment protects people, not places.

> And they would have said that that principle was developed and firmed when the Supreme Court decided *Knotts*, and when the Supreme Court returned to it in *Karo*. And that the whole focus was on the monitoring itself. And that that monitoring in the public place simply did not implicate the 4th Amendment. And that the officers were completely fine and behaving appropriately if they attached a beeper and monitored it in that public place.

> And, you know, the Supreme Court says that *Jones* doesn't change the law. And, of course, I'm bound by their determination that it did not. That the other principle, this trespass principle of 4th Amendment law was always there, it was just sort of dormant. And I will absolutely apply that and be faithful to it. But in the context of whether to suppress.

13

(JA 462-63).

Continuing with its assertion that GPS devices are like beepers, the district

court later stated as follows:

> But that's the point…this isn't a new technology. This is a (sic.) old technology. It's 20, 30, 40 years that police officers have been using beepers, transponders, whatever you want to call them, and following them around. And it's not a subject that the Courts haven't previously addressed. It's not like there's new technology and the police decide they're just going to get out in front of the law and start doing things before they have any guidance from the Courts. There's been all kinds of law on beepers to the point that the issue is just largely settled and resolved and no one even argues about it anymore.
>
> I mean, this -- you know, your analogy would possibly be to something relating to cell phones, and all the new technology with cell towers and so forth. That's new, cutting edge stuff. But Detective Geare, while an impressive guy, he comes at the end of a very, very long line of police officers who have been using beepers attached to cars for decades. And you say you want to incentivize someone in Detective Geare's position to go get legal advice before he starts to use a new cutting edge technology.
>
> Let's talk real here. Let's talk about what Detective Paul Geare in the Baltimore City Police Department in 2011 really, actually does and what's expected of him. I mean, that's like – it's almost on the level of telling Detective Geare that he shouldn't rely on fingerprint evidence because it's not -- even though it's been relied on for 30, 40, 50 years in criminal investigations, there are people out there who have theories that it's not reliable. Okay. But it's largely just a settled question. He wasn't doing anything -- he wasn't pushing the envelope here.

(JA 470-71).

At the conclusion of the argument, the district court found from the bench that police use of the GPS device constituted an illegal search, stating as follows:

> The searches that were involved, and the placement of the GPS device on the car, on the two different occasions, were, as we know with the teaching of *Jones*, illegal. And I think it's impossible to look at the facts of this case and the recovery of evidence in this case and not find that it is tainted by the illegality of the placement of the GPS devices. I just cannot find that the police officers would have been at the club at the appropriate time to encounter the defendant and conduct the K-9 sniff, which ultimately provided the evidence that amounted to probable cause to believe that there was contraband in the car, I can't find that all of that would have occurred without the use of GPS device, which itself had been placed on the car earlier unlawfully.
>
> So the search was bad. And the fruit of that search is at risk for suppression in this case, if the Exclusionary Rule is invoked. So -- and I note that the Government has essentially walked away from any theory that there wasn't significant taint in the case. And they essentially concede that the unlawful placement of the GPS device infects the rest of the investigative activities that ultimately yielded the gun, which is the critical piece of evidence in the case.

(JA 475-76).

The district court then held that the good faith exception to the exclusionary rule applied. (JA 476-79). In so holding, the district court cited the Fifth Circuit's decision in *United States v. Michael*, 645 F.2d 252 (5th Cir.) (en banc), *cert. denied*, 454 U.S. 950 (1981) and the Supreme Court's decision in *Illinois v. Krull*, 480 U.S. 340 (1987). (JA 477-79). Relying on the beeper case in *Michael*, *supra*, the district court essentially determined that beepers and GPS devices were the same for purposes of the Fourth Amendment analysis. (JA 478-79). The district

15

court concluded that the law was "settled" that similar police use of beepers was legal, and that investigators acted in good faith "when the beeper was place on the bumper." (*Id.*) The district court denied the motion to suppress. (JA 479-80).

## SUMMARY OF ARGUMENT

The district court erred by finding the good faith exception to the exclusionary rule applied and thus denying the motion to suppress. At the time of the search in this case, there was no "binding appellate precedent" in the Supreme Court or the Fourth Circuit specifically authorizing the particular police practice here of installing and using a GPS device on an automobile without a warrant. *Davis v. United States*, 131 S.Ct. 2419, 2423-24, 2429 (2011).

During the argument, the district court relied upon the Supreme Court's decisions in *United States v. Knotts*, 460 U.S. 276 (1983) and *United States v. Karo*, 468 U.S. 705 (1984). *Knotts* and *Karo* involved the use of beepers installed in containers that later came into the defendants' possession. *Knotts*, 460 U.S. at 277-78; *Karo*, 468 U.S. at 708-10, 712. Neither case addressed the essential holding in *Jones* – that a trespass occurred when the GPS tracker was placed on the vehicle. *See Jones*, 132 S.Ct. at 949, 951–52. And neither amounted to a "specific authorization of [the] particular police practice" of installing and using a GPS device (or even a beeper) on an automobile without a warrant. *Davis*, 131 S.Ct. at 2423-24, 2429.

**16**

Similarly, the district court generally cited the Supreme Court's decision in *Krull* in support of its decision. *Krull* does not save the search here. *Krull* involved objectively reasonable reliance upon a statute authorizing warrantless administrative searches, which statute was later found to be unconstitutional. *Krull*, 480 U.S. at 342, 359-60. The facts here do not involve police reliance upon a statute. Nor do the facts involve objective reasonable reliance upon any other neutral, third-party authorization of a particular police practice fitting a specific exception to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. Moss*, 963 F.2d 673, 677 (4th Cir. 1992).

The district court's reliance upon the Fifth Circuit decision in *Michael*, 645 F.2d at 255-56, is unavailing as the same is not "binding appellate precedent" in the Fourth Circuit. The Supreme Court's decision in *Jones* severely undercut the decision in *Michael*. And the continued viability of *Michael* is in doubt.

Otherwise, the evidence established that Detective Geare did not act in "objectively reasonable reliance" upon the neutral authorization of a detached third-party, like an appellate panel, a legislature, a clerk of courts or a warrant-issuing judge. Instead, he relied upon his prior practice of not obtaining a warrant for GPS searches, which was common in law enforcement. He further relied upon a lack of knowledge of any cases challenging the validity of such practice. And his

testimony established that there were no exigent circumstances that prevented him from getting a warrant.

Just seven months before the first search in this case, the D.C. Circuit rendered its decision in *United States v. Maynard*, 615 F.3d 544, 558-68 (D.C. Cir. 2010), *aff'd on other grounds sub nom*, *Jones*, 132 S.Ct. at 949. The D.C. Circuit held in *Maynard* that a similar warrantless placement of a GPS device on a vehicle and subsequent use of the device were unlawful. *Id.* at 558-68. Notably, in *Maynard*, the installation of the GPS device on the vehicle occurred in Maryland. *Id.* at 567. Likewise, the installation of the device in the instant appeal occurred in Maryland.

So while the detective here claimed to be unaware of any appellate cases outlawing the practice of installing GPS devices on automobiles without warrants, one such case actually had been decided figuratively in his own back yard. *Id.* at 558-68. And this was the case that the Supreme Court addressed in *Jones*, reaching the same result that such practice was unlawful, albeit for different reasons. *Jones*, 132 S. Ct. at 949. The detective's lack of awareness of the *Maynard* case exemplifies why police generally should resort to the safe harbor of seeking a search warrant for this type of search, as judges have a better grasp of these types of issues. At a minimum, police in the Fourth Circuit should only be allowed to conduct such warrantless GPS searches if, and only if, there is "binding

18

appellate precedent" in this circuit authorizing such searches. *Davis*, 131 S.Ct. at 2434. And there is no such precedent.

Indeed, the First, Fifth, Seventh and Ninth Circuits have since considered application of the good faith exception to the exclusionary rule to warrantless GPS searches that pre-dated *Jones*. *United States v. Martin*, No. 11-1696, 2013 WL 1197849, at *1 (March 25, 2013) (denying rehearing)[2]; *United States v. Sparks*, No. 11-1134, 2013 WL 1197741, at *4 (1st Cir. Mar. 26, 2013); *United States v. Andres*, 703 F.3d 828, 834 (5th Cir. 2013); *United States v. Pineda-Moreno*, 688 F.3d 1087, 1091 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 994 (2013); *United States v. Villa*, No. 10-30080, 2012 WL 5352101 (9th Cir. Oct. 31, 2012). All of these decisions looked to binding appellate precedent in the applicable circuit. *Id.*

During the past month, the Seventh Circuit rendered its decision in *Martin*, 2013 WL 1197849, at *1. The Seventh Circuit in *Martin*, in applying the "binding appellate precedent" rule in *Davis*, looked to Eighth Circuit precedent because the warrantless GPS search on the given automobile was conducted by Iowa police officers bound by precedent in that circuit. *Id.* Finding no binding appellate precedent in the Eighth Circuit authorizing the warrantless GPS search, the

---

[2]     The full citation to the *Martin* decision is as follows: *United States v. Martin*, 664 F.3d 684, 686 (7th Cir. 2011), *reh'g denied*, No. 11-1696, 2013 WL 1197849 (7th Cir. Mar. 25, 2013). The operative opinion here is in the decision denying rehearing at 2013 WL 1197849, at *1.

Seventh Circuit declined to apply the good faith exception to the exclusionary rule. *Id.* (citing *Davis*, 131 S.Ct. at 2434).

Notably, the Seventh Circuit could have, but did not, apply its precedent existing at the time of the search in *Martin*, namely *United States v. Garcia*, 474 F.3d 994 (7th Cir.), *cert. denied*, 552 U.S. 883 (2007). The Seventh Circuit's looking for Eighth Circuit precedent makes sense. *Garcia* was non-binding precedent on the Iowa police officers in the Eighth Circuit and therefore inapposite. *See Martin*, 2013 WL 1197849, at *1; *Davis*, 131 S.Ct. at 2434; *Virginia Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001).

Because there is no such "binding appellate precedent" in the Fourth Circuit authorizing the warrantless installation of a GPS device, this court should reach the same holding in *Martin* that the good faith exception to the exclusionary rule does not apply. *Id.* Otherwise, the district court did not find any other applicable exceptions to exclusionary rule. Instead, the district court determined that the evidence was tainted, but for its erroneous finding of good faith. Under the circumstances, the benefits of deterrence of unlawful warrantless searches outweigh the cost of application of the exclusionary rule. *Davis*, 131 S. Ct. at 2422; *Katz*, 389 U.S. at 357; *Moss*, 963 F.2d at 677. Accordingly, the district court should have granted the second motion to suppress. *Id.*

20

# ARGUMENT

## I.     Standard of Review.

In considering a decision regarding a motion to suppress, this court reviews a district court's legal conclusions de novo and factual findings for clear error. *United States v. Perkins*, 363 F.3d 317, 320 (4th Cir. 2004), *cert. denied*, 543 U.S. 105 (2005).  When a warrantless search or seizure is challenged, the government bears the burden of establishing its validity by a preponderance of the evidence. *Brown v. Illinois,* 422 U.S. 590, 604 (1975); *United States v. Matlock*, 415 U.S. 164, 178 n. 14 (1974).

## II.     The district court erred in denying Stephens' second motion to suppress by finding that, despite the illegal warrantless use of a GPS device, the exclusionary rule should not apply because the law enforcement officers acted in good faith.

### A.

The Fourth Amendment provides in part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  The government's installation of a GPS device on a target's vehicle and its use of that device to monitor the vehicle's movements, constitutes a "search" under the Fourth Amendment.  *Jones*, 132 S. Ct. at 949.   Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable

under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. *Katz*, 389 U.S. at 357.

In the present case, the government conceded and the court found that the use of the GPS device constituted an illegal search that tainted the evidence in this case, which was therefore subject to suppression unless the good faith exception to the exclusionary rule applied. (JA 448-451, 475-76). Given this concession and finding, the only dispute in this appeal is whether the district court erred in finding that the good faith exception to the exclusionary rule applied. (*Id.*).

### B.

"The exclusionary rule was adopted to effectuate the Fourth Amendment right of all citizens 'to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…'" *United States v. Calandra*, 414 U.S. 338, 347 (1974). Pursuant to this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure. *Id.* The purpose of the rule is not to redress the injury to the given "private search victim", but rather "to deter future unlawful police conduct." *Id*. (citing, inter alia, *Mapp v. Ohio*, 367 U.S. 643 (1961)). Still, "[w]hen evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Krull*, 480 U.S. at 347.

In *United States v. Leon*, 468 U.S. 897, 919 (1984), the Supreme Court held that the exclusionary rule does not apply where it would "deter objectively reasonable law enforcement activity." In *Leon*, one such situation included "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id*. at 920. The Supreme Court has since expanded this good faith exception. *See Arizona v. Evans*, 514 U.S. 1, 14 (1995) (extending exception to cover arrest by officer reasonably relying on database of arrest warrant that contained incorrect information where database maintained by judicial employees); *Herring v. United States*, 555 U.S. 135, 137 (2009) (extending *Evans* to cover police recordkeeping errors); *Krull*, 480 U.S. at 349-50 (extending exception to cover search conducted in reasonable reliance on later-invalidated statute); *Massachusetts v. Sheppard*, 468 U.S. 981, 990 (1984) (extending exception to cases where warrant invalid due to judge's clerical error).

The most recent Supreme Court explication of the good faith exception occurred in *Davis*, 131 S.Ct. at 2423-24, 2429. In *Davis*, police conducted a search which – at the time – was lawful under Supreme Court precedent as interpreted by the Eleventh Circuit, namely *New York v. Belton*, 453 U.S. 454, 458-59 (1981) and *United States v. Gonzalez*, 71 F.3d 819, 822, 824-27 (1996). *Davis*, 131 S.Ct. at 2426. The Supreme Court later limited *Belton*'s scope in *Arizona v. Gant*, 556 U.S. 332 (2009). *Davis*, 131 S.Ct. at 2426. This limitation rendered the search in

*Davis* unlawful.  *Id.* at 2426.  As *Gant* was decided while *Davis* was on direct appeal and applied retroactively thereto, the defendant argued that suppression of the firearm was required.  *Id.* at 2431.

The Supreme Court in *Davis* held that "that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."  *Davis*, 131 S. Ct. at 2423-24.  After discussing pertinent post-*Leon* decisions, the Supreme Court reasoned that the exclusionary rule "should not be applied to deter objectively reasonable law enforcement activity." *Id.* at 2429.  Nonetheless, the Supreme Court emphasized that this iteration of the good faith exception applies when "binding appellate precedent specifically *authorizes* a particular police practice…"  *Id.* at 2429 (emphasis in original).

## C.

In the instant case, the district court held that the good faith exception to the exclusionary rule applied.  (JA 479).  The district court reasoned that GPS devices are like beepers, and that the established law at the time of the searches here was that police use of beepers, and therefore GPS devices, did not require a search warrant.  (JA 478-79).  Prior to rendering this decision, the district court supported this premise by referencing Supreme Court decisions on the warrantless use of beepers in *Knotts*, *supra*, and *Karo*, *supra*.  (JA 462-63, 470-71, 477-78).  The

24

district court rested its final decision on the Fifth Circuit decision in *Michael*, *supra*, and the Supreme Court's decision in *Krull*, *supra*. (JA 479).

### D.

The district court erred by going beyond the bright-line rule articulated in *Davis*, which requires the following: (1) "binding appellate precedent"; (2) which precedent "specifically *authorizes* a particular police practice"; and (3) upon which precedent there must be "objectively reasonable reliance" by the police. *Davis*, 131 S. Ct. 2423-24, 2429 (emphasis in the original).

The district court's ruling eschews the state of the law at the time of the searches, which occurred from March 18 to April 12, 2011, and then from May 13 to May 16, 2011. (JA 366, 369-71, 374, 399). At the time of these searches, there was no binding Supreme Court or Fourth Circuit appellate precedent that "specifically *authorize[d]* the particular police practice" of installing a GPS device on an automobile bumper without a warrant. *Davis*, 131 S. Ct. at 2423-24, 2429 (emphasis in the original). Moreover, the government did not establish "objectively reasonable reliance" by the police in this case upon any precedent, whether binding or otherwise. *Id.* The elements of the binding-appellate-precedent explication of the good faith exception in *Davis* are discussed below.

**1.    The district court erred in basing its ruling upon the Fifth Circuit's decision in *Michael*, *supra*, which is not "binding appellate precedent" in the Fourth Circuit.**

In rendering its decision, the district court's cited the Fifth Circuit's decision in *Michael*, *supra*, in conjunction with the Supreme Court's decision in *Krull*, *supra*. (JA 479). This was error in part because *Davis* requires that the appellate precedent at the time of the search must be "binding." *Davis*, 131 S. Ct. at 2423-24, 2429. The Fifth Circuit's decision in *Michael*, *supra*, is not "binding appellate precedent" in the Fourth Circuit. *Virginia Soc'y for Human Life, Inc.*, 263 F.3d at 393 (decision of a federal court of appeals "is only binding within its circuit"); *Davis*, 131 S. Ct. at 2423-24, 2429. Investigators therefore could not rely on *Michael* to authorize the warrantless GPS searches in this case. *Id.*

**2.    The district court did not cite appellate precedent that "specifically *authorizes* [the] particular police practice" of placing a GPS device on an automobile bumper without a warrant. *Knotts*, *Karo*, *Krull* and *Michael* are inapposite.**

The district court's reliance on *Knotts*, *Karo and Krull* is problematic as none of these decisions "specifically *authorizes* [the] particular police practice" of installing a GPS device on an automobile bumper without a warrant. *Davis*, 131 S. Ct. at 2423-24, 2429 (emphasis in the original). The district court's reliance on *Michael* is problematic for the same and other reasons. *Knotts*, *Karo*, *Krull* and *Michael* are discussed below.

26

*Knotts* and *Karo* both involved the placement of beepers in containers, which were then loaded on trucks, to assist police in physically tracking the movements of the same to the given defendants. *Knotts*, 460 U.S. at 282; *Karo*, 468 U.S. at 721. The defendants in both cases, at the time of the placement of the beepers, did not have an ownership or possessory interest in the respective containers receiving the beepers. In *Knotts*, the owner of the container receiving the beeper consented to placement of the beeper. *Knotts*, 460 U.S. at 278. In *Karo*, the government owned the container receiving the beeper. *Karo*, 468 U.S. at 708, 711. The government substituted this container with another container owned by someone else, with the substitution occurring with this other person's consent. *Id.* In both cases the container with the beeper did not come into the given defendant's possession until later after the placement. *Knotts*, 460 U.S. at 278; *Karo*, 468 U.S. at 708, 711.

In his opinion in *Jones*, Justice Scalia observed that *Knotts* and *Karo* did not authorize the warrantless, non-consensual installation of a beeper on a vehicle then owned or possessed by a given defendant. *Jones*, 132 S.Ct. at 951-52. Specifically, Justice Scalia found that *Knotts* never addressed the constitutionality of such installation and was limited to the defendant's reasonable expectation of privacy. *Id.* (stating the defendant in *Knotts* "did not challenge that installation [of the beeper], and we specifically declined to consider its effect on the Fourth

Amendment analysis."). He then stressed that the decision in *Karo* addressed the limited issue of "whether the installation '*with the consent of the original owner* constitute[d] a search or seizure...when the container is delivered to a buyer having no knowledge of the presence of the beeper.'" *Jones*, 132 S.Ct. at 952 (emphasis in original) (quoting *Karo*, 468 U.S. at 707).

Contrasted with *Knotts* and *Karo*, the decision in *Jones* involved the warrantless, non-consensual placement of a GPS device on an automobile in which the defendant had an ownership or possessory interest, thereby resulting in a trespass. *Jones*, 132 S.Ct. at 948-49, 952. The Supreme Court in *Jones* found this to be a critical distinction. *Id.* at 952 (describing the defendant in *Jones* as being "on much different footing" than the *Knotts* and *Karo* defendants because he possessed the vehicle at the time the government installed the GPS tracker). And such warrantless, non-consensual placement was not specifically authorized by *Knotts* and *Karo*. *Jones*, 132 S.Ct. at 951-52; *Knotts*, 460 U.S. at 278, 282; *Karo*, 468 U.S. at 711, 714, 721.

The district court's ruling also assumes that the beepers in *Knotts* and *Karo* are the same as a GPS device for purposes of a Fourth Amendment analysis. They are not. *Knotts* forecasted the analysis here that differentiates beepers from GPS devices. Specifically, *Knotts* noted that the defendant asserted that the "twenty-four hour surveillance of any citizen of this country will be possible, without

judicial knowledge or supervision." *Knotts*, 460 U.S. at 283. However, *Knotts* explicitly held that its authorization of the limited use of beepers in that case did not apply to the "dragnet type law enforcement practices" suggested by the defendant. *Knotts*, 460 U.S. at 284. Later, the Supreme Court in *Karo* did not alter *Knotts*' reservation of the constitutionality of such "dragnet type" investigations. *Karo*, 468 U.S. at 716-21; *Knotts*, 460 U.S. at 283-84.

*Knotts* and *Karo* were decided more than 25 years before the use of the GPS device in this case. Both cases addressed different technology. The beepers in *Knotts* and *Karo* emitted a signal for live tracking of a vehicle on a public highway. *Knotts*, 460 U.S. at 277-79, 281; *Karo*, 468 U.S. at 707, n.1, 708-09, 714. In contrast, as demonstrated in Government's Exhibit 1, the GPS device in this case permitted limitless data harvesting of nearly all of the Chrysler's movements, during all minutes of the day, for an infinite number of days, and a multi-state geographic scope, aside from an occasional battery change. (JA 361-62, 370, 539-609). The GPS device produced copious amounts of data that investigators were able to spot monitor on later dates, as opposed to being required to conduct live police surveillance with the beepers in *Knotts* and *Karo*. (JA 367-68, 536-609). Applying this same rationale, the D.C. Circuit in *Maynard* recognized the obvious differences between twenty-four hour GPS surveillance and the limited surveillance in *Knotts*. *Maynard*, 615 F.3d at 558 (observing police

used GPS device not to track the defendant's movement form one place to another, but to track his movements "24 hours a day for 28 days").

Given the foregoing, *Knotts* and *Karo* could not have supplied Detective Geare and the other investigators with the requisite specific authorization to conduct the warrantless GPS searches here. *See Davis*, 131 S.Ct. at 2429 and 131 S.Ct. at 2428 (observing that "the officers' conduct was in **strict compliance** with then-binding Circuit law" and that the officers "followed the Eleventh Circuit's *Gonzalez* precedent to the letter") (emphasis added).

Shifting to the Supreme Court's decision in *Krull*, this opinion does not specifically authorize the particular police practice of placing a GPS device an automobile bumper without a warrant. *Krull*, 480 U.S. at 342, 359-60; *Davis*, 131 S. Ct. at 2423-24, 2429. Rather, *Krull* addressed whether the good faith exception to the exclusionary rule applies when officers act in objectively reasonable reliance upon a statute authorizing warrantless administrative searches, but where the statute is later found to violate the Fourth Amendment. *Krull*, 480 U.S. at 342, 359-60. *Krull* is factually inapposite and could not have supplied Detective Geare and the other investigators with the requisite specific authorization to conduct the warrantless GPS searches here. *Id.*; *Davis*, 131 S. Ct. at 2423-24, 2429.

The district court's reliance upon the Fifth Circuit's decision in *Michael* is misplaced. Specifically, *Michael* assumed without deciding that placement of a

beeper on the van constituted a search. *Michael*, 645 F.2d at 256. *Michael* then found that the beeper search was supported by reasonable suspicion of criminal activity and therefore **was lawful**. *Id.* at 257, 259. *Michael* never reached whether the good faith exception to the exclusionary rule should apply. *Id.* at 257, 259. Contrasted with *Michael*, the government conceded, and the district court found, that the GPS searches here **were unlawful** and that **the only remaining issue was whether the good faith exception to the exclusionary rule applied**. (JA 448-49, 450-51, 475-76).[3] Thus, *Michael* is inapposite to the district court's application of the good faith exception to the exclusionary rule applied. *Id.* at 257.

The district court's reliance upon *Michael* also suffers from the same infirmities mentioned above. *Michael* is not binding appellate precedent in the Fourth Circuit. *Virginia Soc'y for Human Life*, 63 F.3d at 393. And the above analysis of *Knotts* and *Karo* demonstrates why beepers are not the same as GPS devices for Fourth Amendment purposes. Significantly, *Michael* is even older than *Knotts* and *Karo*. And *Michael* does not address the reservation in *Knotts* of the constitutionality of "dragnet type law enforcement practices" involving warrantless

---

[3]     This concession and finding make sense. Detective Geare said he developed reasonable suspicion that Stephens had a gun on his person after observing him perform the "security check" on the night of his arrest. (JA 435). And the government conceded that illegal use of the GPS device put Detective Geare and his partner at the school, and then the apartment, and then the club at the specific times that observations were made and evidence was obtained. (JA 450-51).

"twenty-four hour surveillance" of an automobile with a beeper. *Knotts*, 460 U.S. at 283-84; *Michael*, 645 F.2d at 255-59.

The Supreme Court's decision in *Jones* undercuts the persuasive value of *Michael*. In assuming without deciding that the installation of a beeper on a van was a Fourth Amendment search, the *Michael* court stated that "some members of the majority would hold that the installation of the beeper on the van is not a search or seizure at all." *Michael*, 645 F.2d at 256. The *Michael* court also reasoned that "[a]lthough the attachment was technically a trespass, 'arcane distinctions developed in property...law' are not controlling." *Id*. (source of quotation not identified). The Supreme Court in *Jones* disagreed with both of these propositions, thus undermining *Michael*'s value here. *See Jones*, 132 S.Ct. at 954 (observing that the placement of a GPS tracker was a "classic trespassory search"); *United States v. Ortiz*, 878 F. Supp. 2d 515, 530 (E.D. Pa. 2012).

Even if considered as persuasive, non-binding authority, the continued viability of *Michael* is in doubt. *Ortiz*, 878 F. Supp. 2d at 530. *Michael* was decided by a fourteen-to-ten margin over strongly worded dissents. *Id.*; *see Michael*, 645 F.2d at 261 (Tate, J., dissenting) (describing the use of the beeper as "a trespass that enables [the government] to maintain continuous electronic surveillance over [a person's] movements twenty-four hours per day continuously and indefinitely"). And seven members of the majority, in two concurring

32

opinions, subscribed to the theory rejected in *Jones* that "attachment of a beeper to an automobile...is neither a search nor a seizure," *see id*. at 259 (Clark, J., concurring).  Given the foregoing and the Supreme Court's decision in *Jones*, the district court's reliance upon *Michael* was misplaced.

> **3.     At the time of the GPS searches, there was no binding Supreme Court or Fourth Circuit precedent.  And the law outside of the Fourth Circuit was unsettled, with the few circuits addressing this issue split on the analysis and lawfulness of installing a GPS device on an automobile bumper without a warrant.**

The district court's suggestion, and ultimate holding, that the law on the warrantless use of GPS devices was "settled" ignores the state of the law at the time of the searches.  (JA 432-63, 470-71, 478).  Notably, on this issue, the district court observed in the first suppression hearing that there was no "clear precedent to guide the Court, other than the broad general notions that monitoring people -- law enforcement monitoring of citizens in other otherwise public places does not implicate the 4th Amendment."  (JA 210).

Despite the district court's holding in the hearing on the second suppression motion, the law was not "settled" as to the warrantless, nonconsensual placement of a GPS device on an automobile.  There was no binding appellate precedent from the Supreme Court or the Fourth Circuit upon which Detective Geare and the other investigators could rely to justify the warrantless GPS searches here.  *Davis*, 131 S. Ct. at 2423-24, 2429.

Only a minority of the sister circuits had addressed this practice. This minority split on the analysis and lawfulness of the warrantless installation of GPS devices on automobiles. *Maynard*, 615 F.3d at 560; *Garcia*, 474 F.3d at 996-98; *United States v. Marquez*, 605 F.3d 604, 609-10 (8th Cir.2010); *United States v. Pineda-Moreno*, 591 F.3d 1212, 1214-17 (9th Cir.2010), *vacated*, 132 S.Ct. 1533 (2012); *United States v. Smith*, 387 F. App'x 918, 921 (11th Cir. 2010).

The split among the minority of circuits addressing this issue – at the time of the searches here – undermines the district court's suggestion and holding that the law was "settled". (JA 432-63, 470-71, 478). The D.C. Circuit had held that GPS tracking required a warrant. *Maynard*, 615 F.3d at 560. The Seventh and Ninth Circuits had held that installation and monitoring of a GPS device was not a Fourth Amendment search. *Garcia*, 474 F.3d at 996-98; *Pineda–Moreno*, 591 F.3d at 1217; *McIver*, 186 F.3d at 1127. The Eighth Circuit had held that installation and use of GPS device was a Fourth Amendment search but could be supported by reasonable suspicion. *Marquez*, 605 F.3d at 609-10. The Eleventh Circuit held that the warrantless installation of a GPS device on a vehicle is permissible if the vehicle was "parked in a place easily accessible to the public and was reachable from a public thoroughfare." *Smith*, 387 F. App'x at 921. No other sister circuits had ruled on the issue.

The Seventh Circuit is the only federal appellate jurisdiction that has addressed warrantless GPS searches that occurred before *Jones*, in the context of "binding appellate precedent" required by *Davis*, **where there was no binding appellate precedent in the dispositive circuit at the time of the search**. Specifically, the Seventh Circuit rendered two decisions from the same case, with the first establishing certain operative facts, *Martin*, 664 F.3d at 686, and the second addressing the "binding appellate precedent" rule in *Davis*. *Martin*, 2013 WL 1197849, at *1.

In the first opinion in *Martin*, the Seventh Circuit noted that police from Burlington, Iowa suspected that the given defendant was involved in a robbery. *Martin*, 664 F.3d at 686. Police from this jurisdiction installed a GPS device on the defendant's vehicle on November 19, 2009, and used the device to track the defendant until November 23, 2009.[4] *Id.* On the same date, police contacted law enforcement officers in Illinois seeking assistance, as the defendant was heading toward that state. *Id.* The defendant was arrested in Warren County, Illinois by police officers from that jurisdiction. *Id.* Incident to the arrest, the Warren County police recovered illegal drugs and a gun. *Id.* at 686-87. The Seventh Circuit

---

[4]    The opinion in *Martin*, 664 F.3d at 686, is a little unclear about the dates that the GPS device was installed and monitored. However, the district court's order denying the suppression motion clarifies this point. The district court's order is at Docket Entry 43 in *United States v. Martin*, No. 4:10-cr-40008-MMM-JAG (C.D. Ill September 19, 2012).

ultimately affirmed the judgment against this defendant. *Id.* at 690. However, while the petition for rehearing was pending, the Supreme Court rendered its decision in *Jones. Martin*, 2013 WL 1197849, at *1. The Seventh Circuit granted a limited remanded to address the search issue in *Jones. Id.*

After the district court denied the motion to suppress in *Martin*, the Seventh Circuit held that the good faith exception to the exclusionary rule should not apply because there was no applicable binding appellate precedent in the Eighth Circuit wherein the Iowa police officers installed the GPS device. 2013 WL 1197849, at *1 (citing *Davis*, 131 S.Ct. at 2434). Notably, the Seventh Circuit strictly adhered to the "binding appellate precedent" rule by looking to the Eighth Circuit, which precedent bound the Iowa police officers who installed the GPS device. *Id.* The Seventh Circuit found no such binding precedent (as the first the Eighth Circuit decision on this issue was decided after the search in *Martin*, specifically the above-cited decision in *Marquez*, 605 F.3d at 604, decided May 21, 2010).

Notably, the Seventh Circuit in *Martin* did not apply its own appellate precedent, specifically the above-cited decision in *Garcia* which held that the installation of a GPS device not constitute a search. *Martin*, 2013 WL 1197849, at *1; *Garcia*, 474 F.3d at 996-98 (decided March 29, 2007). This makes sense because *Garcia* was decided before *Davis*' holding on "binding appellate precedent". And in adherence to this new "binding appellate precedent" rule in

36

*Davis*, the Seventh Circuit in *Martin* determined that for the Iowa police officers

such precedent would have to exist in their own circuit, the Eighth Circuit. *Martin*,

2013 WL 1197849, at *1; *see also Virginia Soc'y for Human Life, Inc.*, 263 F.3d at

393. Thus, the Seventh Circuit in *Martin* explained its decision as follows:

> On the limited remand, the district court concluded that, pursuant to *Davis v. United States*, ___ U.S. ___, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011), suppression was not warranted because of the "officer's good faith reliance on then-existing precedent." With respect, we find that to be an unwarranted expansion of the Supreme Court's decision in *Davis* and not one that we should adopt in the present case. *Davis* expanded the good-faith rationale in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), only to "a search [conducted] in objectively reasonable reliance on binding appellate precedent," finding that this set of searches are not subject to the exclusionary rule. *See Davis*, 131 S.Ct. at 2434 (emphasis added). As Justice Sotomayor pointed out in her opinion concurring in the judgment, Davis "d[id] not present the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." 131 S.Ct. at 2435. The Supreme Court may decide to expand Davis in the coming years, but until it does so, we are bound to continue applying the traditional remedy of exclusion when the government seeks to introduce evidence that is the "fruit" of an unconstitutional search. **We reject the government's invitation to allow police officers to rely on a diffuse notion of the weight of authority around the country, especially where that amorphous opinion turns out to be incorrect in the Supreme Court's eyes. Here, as Martin points out in his supplemental brief, there was no binding appellate precedent in the Eighth Circuit at the time that Iowa law enforcement officials attached the GPS device to Martin's car**.

*Martin*, 2013 WL 1197849, at *1 (emphasis added).

The First, Fifth and Ninth Circuits have since addressed warrantless GPS

searches that occurred before *Jones* in the context of "binding appellate precedent"

required by *Davis*. All three circuits resorted to such binding appellate precedents within their respective jurisdictions as well. *Sparks*, 2013 WL 1197741, at *4 (citing *United States v. Moore*, 562 F.2d 106 (1st Cir.1977)); *Andres*, 703 F.3d at 834 (citing *Michael*, 645 F.2d at 257); *Pineda-Moreno*, 688 F.3d at 1091 (citing *United States v. McIver*, 186 F.3d 1119, 1126-27 (9th Cir.1999)); *Villa*, 2012 WL 5352101, at *1 (9th Cir. Oct. 31, 2012) (citing *Pineda-Moreno*, 688 F.3d at 1091).

The First Circuit in *Sparks* held that there was no need to consider non-binding authority, finding that there was binding circuit precedent that authorized the GPS search in that case. 2013 WL 1197741, at *4. *Sparks* relied upon its prior decision concerning the warrantless installation of a beeper on an automobile in *United States v. Moore*, 562 F.2d 106 (1st Cir.1977). *Sparks* determined that "*Moore* squarely supported the agents' attachment of the GPS tracker to the Chrysler when it happened (although *Jones* has since abrogated Moore's conclusion on the trespass question, see 132 S.Ct. at 949)." *Sparks*, 2013 WL 1197741, at *7 (citing *Moore*, 562 F.2d at 111-13). *Sparks* concluded that, after considering *Moore* in conjunction with *Knotts* and also *Karo*, the FBI's decision to install a GPS tracker instead of a beeper, and to monitor the same for over a week, was objectively reasonable. *Id.* at *4-8 (citing *Davis*, 131 S.Ct. at 2423-24, 2428).

The Fifth Circuit in *Andres* applied a plain error analysis to hold that evidence should not be suppressed as the officers acted in reasonable reliance on

circuit precedent on the warrantless installation of a beeper on an automobile, namely its prior decision in *Michael*. *Andres*, 703 F.3d at 834 (citing *Michael*, 645 F.2d at 257). *Andres* found that the functionality of a beeper and a GPS device were sufficiently similar that the agents' reliance on *Michael* to install a GPS device on the truck, in light of the reasonable suspicion of drug trafficking, was objectively reasonable. *Id.* at 835 (citing *Davis*, 131 S.Ct. at 2423-24).

The Ninth Circuit in two cases found that the warrantless installation of GPS tracking devices were based upon objective police reliance on then-binding precedent. First, in *Peneda-Moreno*, 688 F.3d at 1089-90, the Ninth Circuit found that police objectively relied upon its prior decision in *McIver*, 186 F.3d 1119, 1126-27 to justify the warrantless installation and use of tracking devices (that pinpointed and logged locations using cellular towers or satellites) on automobiles. Second, in *Villa*, 2012 WL 5352101, at *1-2, the Ninth Circuit cited *Pineda–Moreno*, 688 F.3d at 1091, for the same purpose with respect to such GPS devices.

Common to all of these circuit decisions is adherence to the "binding appellate precedent" in *Davis*, *supra*. *Martin*, 2013 WL 1197849, at *1; *Sparks*, 2013 WL 1197741, at *4-8; *Andres*, 703 F.3d at 835; *Peneda-Moreno*, 688 F.3d at 1089-90; *Villa*, 2012 WL 5352101, at *1-2. This court should follow this common thread of looking for binding appellate precedent in the Fourth Circuit as a condition of applying the good faith exception under *Davis*. *Id.*

In particular, this court should follow the Seventh Circuit's holding in *Martin*, to find that the good faith exception cannot apply as there was no "binding appellate precedent" in the Fourth Circuit, at the time of the search, authorizing the warrantless installation of a GPS device on an automobile. 2013 WL 1197849, at *1. And assuming, *arguendo*, that a GPS device is like a beeper for Fourth Amendment purposes, as found in *Sparks* and *Andres*, the good faith exception still should not apply as there do not appear to be any comparable Fourth Circuit cases authorizing the warrantless installation of beepers to automobiles. *Davis*, 131 S.Ct. at 2423-24; *see Sparks*, 2013 WL 1197741, at *4, 7; *Andres*, 703 F.3d at 835.

**4.    The government failed to establish that police acted with "objectively reasonable reliance" upon a neutral and detached third-party authorization of the particular police practice of placing a GPS device on an automobile bumper without a warrant.**

"It is incumbent on the officer executing a search…to ensure the search is lawfully authorized and lawfully conducted." *Groh v. Ramirez*, 540 U.S. 551, 563 (2004). "A search conducted without a warrant issued by a judge or magistrate upon a showing of probable cause is 'per se unreasonable' unless it falls within one of the 'specifically established and well-delineated exceptions' to the warrant requirement. *United States v. Simons*, 206 F.3d 392, 399-400 (4th Cir. 2000) (quoting *Katz*, 389 U.S. at 357). For the good faith exception to the exclusionary rule to apply, "mistaken determinations of police officers that may be excused as

**40**

good faith, reasonable ones, must yet be related to elements of one of these exceptions [to the warrant requirement in the Fourth Amendment]." *Moss*, 963 F.2d at 677. Where a warrantless search is not derived from a specifically recognized exception to the warrant requirement, the good faith exception is inapplicable and the evidence should be suppressed. *Id.*

Here, Detective Geare's testimony concerning the use of the GPS device did not establish an "objectively reasonable reliance" upon a warrant or a specific exception to the warrant requirement. *Katz*, 389 U.S. at 357; *Moss*, 963 F.2d at 677. His testimony does not point to binding appellate precedent, a statute, a judicially authorized warrant, or some other neutral and detached third party source specifically authorizing the police practice here. *See Davis*, 131 S. Ct. at 2423-24, 2429; *Leon*, 468 U.S. at 916-917; *Evans*, 514 U.S. at 14; *Herring*, 555 U.S. at 137; *Krull*, 480 at 349-50; *Sheppard*, 468 U.S. at 990.

Rather than establishing "objectively reasonable reliance" upon a warrant or a specific exception to the warrant requirement, Detective Geare's testimony established that no steps were taken to determine whether his warrantless use of the GPS device was lawful. (JA 362, 364-65, 422). He did not procure a court order, a search warrant or other specific authorization to justify his warrantless use of the GPS device. (JA 362). He never engaged in any discussions about whether he should obtain a warrant, despite having access to the U.S. Attorney's office, the

State's Attorney's Office, legal counsel for the city police department, the ATF, and the courts. (JA 364-65, 422). And he never conducted any legal research to ascertain the lawfulness of his warrantless use of the GPS device. (JA 422).

Instead, Detective Geare relied upon the assertion that he has previously used such GPS devices without a warrant, and that such practice was common in law enforcement at the time of the search. (JA 364). In this regard, Detective Geare never mentioned any exigent circumstances that prevented him from obtaining a warrant in connection with the use of the GPS device. Specifically, the first use of the GPS device coincided with the initial investigation of Stephens on March 18, 2011. (JA 361, 366, 370, 399). Investigators were in no hurry to harvest the data. Rather, they waited until March 20, 2011 to receive the information from the device, and thereafter only "spot monitored" the device. (JA 366-38, 370, 399). Investigators then had time to remove the device on April 12, 2011, and reinstall the same 31 days later on May 13, 2011. (JA 370-71, 374, 399). By the time of the second use of the GPS device, Detective Geare acknowledged that the investigation was not progressing very quickly, as investigators worked the case "off and on." (JA 370).

Detective Geare's testimony establishes that there were no exigent circumstances precluding him and the other investigators from obtaining a warrant. Detective Geare's justification for the warrantless search is devoid of objective

inquiry, particularly the neutral and detached inquiry and oversight contemplated by the Supreme Court in *Davis*, *Leon*, *Evans*, *Herring*, *Krull* and *Sheppard*. *See id.*

For similar reasons, Detective Geare's failure to take steps to ascertain whether there were any applicable appellate precedents, whether binding or otherwise, undercuts the district court's determination that the detective had a good faith basis under *Knotts*, *Karo* and *Michael* to conduct this GPS search without a warrant. *See Katz*, 389 U.S. at 357; *Moss*, 963 F.2d at 677. His ignorance of such appellate precedents cannot substantiate a finding of reasonable objective good faith reliance upon the same where he never bothered to ascertain the lawfulness of his actions. *See id.*

Detective Geare's mistaken belief of the lawfulness of the warrantless use of GPS devices is not related to elements of one of the exceptions to the warrant requirement, as articulated in *Davis*, *Leon*, *Evans*, *Herring*, *Krull* and *Sheppard*. *See Katz*, 389 U.S. at 357; *Moss*, 963 F.2d at 677; *Davis*, 131 S. Ct. at 2423-24, 2429; *Leon*, 468 U.S. at 916-917; *Evans*, 514 U.S. at 14; *Herring*, 555 U.S. at 137; *Krull*, 480 at 349-50; *Sheppard*, 468 U.S. at 990. Because his attempted justification of the warrantless use of the GPS device is not grounded in one of the recognized exceptions to the warrant requirement, his conduct does not amount to objective good faith. *See id.*

**5. The benefits of deterrence of unlawful warrantless searches outweigh the costs of the application of the exclusionary rule.**

The rule articulated in *Davis* cannot be any clearer. The opinion repeatedly underscores the requirement that the appellate precedent must be "binding" for reliance upon the same to be objectively reasonable. *Davis*, 131 S. Ct. at 2423-24, 2428, 2432, 2434. The *Davis* court did not articulate a diminished or alternative standard for non-binding appellate precedent. *See id.*

The *Davis* court also forecasted the circumstances presented in this case, stating as follows: "**[i]f one or even many of [the stated and federal courts of appeal] uphold a particular type of search or seizure, defendants in jurisdictions in which the question remains open will still have an undiminished incentive to litigate the issue**". *Id* at 2433 (emphasis added). Justice Sotomayor in her concurring opinion made a similar observation. *See id.* at 2435 (Sotomayor, J., concurring in the judgment) (clarifying that the "markedly different question" whether the exclusionary rule applies when the law relied upon was unsettled was not before the Court).

The Eleventh Circuit panel's decision, which *Davis* affirmed, also sheds light on the purpose of the "binding appellate precedent" exception. The Eleventh Circuit stated as follows:

> We stress, however, that our precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation. We have not forgotten the importance of the "incentive to err on the

44

side of constitutional behavior," and we do not mean to encourage police to adopt a "let's-wait-until-it's-decided approach" to "unsettled" questions of Fourth Amendment law.

*United States v. Davis*, 598 F.3d 1259, 1266-67 (11th Cir. 2010) (quoting *United States v. Johnson*, 457 U.S. 537, 561 (1982)), *aff'd* 131 S. Ct. 2434 (2011).

Whether GPS tracking constituted a search in the Fourth Circuit is precisely the type of "open" legal question that *Davis* placed outside of the scope of the exception – particularly given the absence of binding appellate precedent in the Fourth Circuit and the foregoing split among the few sister circuits that had addressed this issue. *See Davis*, 131 S. Ct. at 2433; *Maynard*, 615 F.3d at 560; *Marquez*, 605 F.3d at 609-10; *Garcia*, 474 F.3d at 996-98; *Pineda–Moreno*, 591 F.3d at 1217; *Smith*, 387 F. App'x at 921.

The import of *Davis* is that officers acting without clearly applicable binding appellate guidance should err on the side of caution and obtain a warrant. *See Karo*, 468 U.S. at 717–18, 104 S.Ct. 3296 ("Requiring a warrant will have the salutary effect of ensuring that use of beepers is not abused, by imposing upon agents the requirement that they demonstrate in advance their justification for the desired search...[I]f truly exigent circumstances exist no warrant is required under general Fourth Amendment principles.").

Clearly, Detective Geare acted without binding appellate guidance and failed to obtain a warrant. Instead, he used prior police practices and lack of knowledge

of the law as his justification for failing to obtain a warrant. This is the sort of impermissible ad-hoc approach that *Davis* and *Johnson* forbid. Moreover, the government's and district court's assertion that law enforcement officers may rely upon non-binding precedent in *Michael*, *supra*, would enable law enforcement officers to effectively choose which circuit courts to listen to and which to ignore.

When executing searches, federal officers need only know the binding decisions of the Supreme Court and their circuit's court of appeals. *Davis*, 131 S. Ct. at 2423-24, 2429; *United States v. Lee*, 862 F. Supp. 2d 560, 570 (E.D. Ky. 2012). Conversely, expanding the exception to non-binding authority raises more questions, like the following: How many circuits must support a practice before an officer can rely on it in good faith? Two? Four? A majority? What if the judges on one panel are particularly well-respected? What if others are not? And what if several district courts, but no courts of appeals, support a practice? *Lee*, 862 F. Supp. 2d at 570. As the district court in *Lee* observed, "[a]llowing officers to rely on non-binding authority raises all of these questions, but answers none of them." Because *Davis* only excuses objective good faith reliance on binding appellate precedent, resort to non-binding precedent cannot justify a particular police practice. *Id.*; *Davis*, 131 S. Ct. 2423-24, 2429; *Martin*, 2013 WL 1197849, at *1.

**6.    The tainted evidence in this case should have been suppressed.**

Consistent with the foregoing, it is clear that there was no binding appellate precedent specifically authorizing the particular police practice of attaching and monitoring a GPS device without a warrant. Nor was there a reasonable objective reliance upon one of the neutral and detached third-party sources to authorize such search, like an appellate panel, a legislature, a clerk of courts, or a warrant-issuing judge. These were not exigent circumstances, and the benefits of deterrence of unlawful warrantless searches outweigh the costs of the application of the exclusionary rule. To hold otherwise would eviscerate the Fourth Amendment based upon police proclaimed exceptions to the warrant requirement, which proclamations lack any of the objective, neutral third-party justifications for conducting a warrantless search.

As the government conceded, and the district court held, the investigation and evidence are tainted by the illegal use of the GPS device, including the gun that is the subject of Stephens' conviction. (JA 448-51, 475-76). The district court erred in refusing to suppress the evidence in this case based on the good faith exception to the warrant requirement. Stephens' conviction must be vacated and remanded, with the all of the evidence derived from the illegal use of the GPS device to be suppressed, including the GPS data and evidence and information derived therefrom in West Virginia and Maryland on and before May 16, 2011.

*Krull*, 480 U.S. at 347; *Calandra*, 414 U.S. at 347; *Moss*, 963 F.2d at 679-80; *Brown*, 422 U.S. at 601-04; *Wong Sun v. United States*, 371 U.S. 471, 484-91 (1963).

Evidence to be suppressed includes the following: (1) Government's Exhibits 1 through 10; (2) evidence obtained prior to May 16, 2011 about Stephens' alleged travel to and from West Virginia, including GPS data and evidence derived therefrom; (3) evidence obtained on May 16, 2011, including GPS data and evidence derived therefrom, the investigators' observations of Stephens' performing a security check for a firearm at the apartment complex, the K-9 alerts on the Chrysler in the apartment and club parking lots, and physical evidence (and corresponding photographs) recovered from Stephens and the Chrysler in the club parking lot, and Stephens' statement to the police.  *See id.* Pursuant to Fed. R. Crim. P. 11(a)(2), Stephens must then be given the opportunity to withdraw his guilty plea and plead anew.

## **CONCLUSION**

Stephens' conviction must be vacated and remanded, with the foregoing evidence to be suppressed and with Stephens to be given the opportunity to withdraw his guilty plea and plead anew.

48

## <u>REQUEST FOR ORAL ARGUMENT</u>

Stephens submits that the issues in this appeal may be more fully developed if oral argument is granted.  Stephens therefore requests oral argument.

Respectfully submitted,

<u>/s/ Christopher F. Cowan</u>
Christopher F. Cowan
LAW OFFICE OF CHRIS F. COWAN
713 South Front Street
Columbus, Ohio  43206
(614) 884-8800 (Telephone)

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,063 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because this brief has been prepared in a proportionally spaced typeface using a Microsoft Word, 14-point, Times New Roman font.  This information is true and correct to the best of my knowledge, information and belief.  I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the work or line print-out.

<u>/s/ Christopher F. Cowan</u>
Christopher F. Cowan

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of April, 2013, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> A. David Copperthite
> Office of the United States Attorney
> 36 South Charles Street, 4th Floor
> Baltimore, Maryland  21201
> (410) 209-4805
> *Counsel for the Plaintiff-Appellee*

I further certify that I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Christopher F. Cowan
Christopher F. Cowan
